STATE OF INDIANA
LAKE COUNTY SUPERIOR COURT

| | | |
|---|---|---|
| CEZARA CRISAN, | ) | |
| | ) | |
| Plaintiff, | ) | CAUSE NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| THE BOARD OF TRUSTEES | ) | |
| OF PURDUE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES the plaintiff, Cezara Crisan ("Plaintiff" or "Crisan"), by counsel, and for her Complaint against the defendants, the Board of Trustees of Purdue University ("Purdue," "the University," or "Defendant"), alleges as follows:

**Jurisdiction, Venue & Cause of Action**

1. This action is authorized and instituted pursuant to Indiana common law.

2. This Court is a court of general jurisdiction, and thereby has jurisdiction over Plaintiff's federal claims.

3. On or about June 11, 2022, Crisan filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of sex and national origin (Charge No. 470-2022-03110).

4. The EEOC issued a Notice of Right to Sue (after making no determination) on September 16, 2022. Plaintiff files this action within 90 days of her receipt of the Notice of Right to Sue.

5. Lake County, Indiana is an appropriate venue for this action by virtue of Trial Rule 75 because Purdue University Northwest ("PNW") is located here, most of the actions alleged occurred here, and most of the evidence relevant to this action is likely to be located here.

## Factual Allegations

6. Crisan is female of Romanian national origin and speaks with a foreign accent.

7. Crisan holds a Bachelor of Arts in Sociology from Purdue University Calumet, a Master of Arts in Sociology from Loyola University in Chicago, Illinois and a Doctorate in Sociology from Loyola University.

8. In April 2009, Crisan began working at PNW in Hammond in a non-tenure track position. Purdue hired her into a tenure-track assistant professor position in the summer of 2016. Crisan's promotion was memorialized in a letter of appointment signed by the parties in February and March of 2016 ("appointment letter"). Exhibit A.

9. Purdue "specifically incorporated" a number of its policies into Crisan's 2016 letter. Ex. A at p. 2. Purdue's B-48 policy, which governed tenure, incorporated other policy documents, all of which were available on Purdue's website at the time of Crisan's 2016 appointment and remain available on the website today. Ex. B. Purdue reserved the right to amend the policies from time to time. Ex. B. The policies attached to this complaint were in place at the time of Crisan's tenure review.

10. B-48 incorporates policy I.B.2, which sets forth Purdue's general tenure principles and criteria. Describing tenure as "fundamentally a system of faculty review," the policy affords tenure applicants "a multi-stage review by faculty and professional peers." Ex. C p. 4; Ex. D p. 4.

11. Because of its importance to faculty and to the University, the tenure review is conducted by seven levels of decisionmakers. The review begins with an assessment of the candidate's record by his/her department, which is followed by a review and recommendation by the chair, a college tenure and promotion committee, the dean of the college, a University Promotion Committee ("the University Committee"), and the Provost. The Chancellor of the campus then makes the final decision.

12. All members of these committees are required to "become familiar with, and knowledgeable of, the contents of the candidate's application packet and evidentiary materials prior to meetings and be prepared to discuss and vote on each candidate in a thoughtful and considered fashion.." Ex. F p. 12 § 2(a). It is the Provost's responsibility to ensure "that all involved faculty members and administrators adhere to the policies and procedures" during the tenure process. *Id.* p. 17 § 8(f).

13. Policy I.B.2 incorporates yet another policy document, Procedures for Granting Academic Tenure and Promotion. Ex. E. That document specifies that the tenure review is to be conducted "in light of standards appropriate for the nominee's

3

discipline and the applicable campus's Criteria for Tenure and Promotion." Ex. E § II(A); see also Ex. F § I(C)(1)(d).

14. Because Crisan is a faculty member in the College of Humanities, Education, and Social Sciences ("CHESS"), that college's tenure criteria applied to the evaluation of her application.

15. Candidates for tenure at Purdue are evaluated according to three general categories of performance: "learning" (which encompasses all faculty-student interaction such as teaching and mentoring), "discovery" (i.e., the dissemination of scholarly research), and "engagement" (i.e., professional service to the University, profession and community). Ex. F § I(C)(1).

16. To earn tenure and promotion to Associate Professor, faculty must demonstrate "significant progress toward excellence in learning or discovery, together with sustained growth toward strength in the other and with active participation in engagement." Ex. F § I(C)(2)(a).

17. The CHESS Supplementary Promotion & Tenure Guidelines ("CHESS Guidelines") elaborate about what constitutes sufficient "excellence" and "strength" for tenure.

18. The CHESS Guidelines include the following standards and criteria:
    a. Interdisciplinary work is to be valued as much as work within a single discipline. Ex. G § I(C).
    b. The dissemination of published work as well as work in progress (at regional, national, and international academic venues) is an integral

4

      part of the research process and thus required of all candidates at every phase of career development. *Id.* § I(D).

c. The work of candidates seeking to demonstrate progress towards excellence in learning is evaluated by 5-10 experts in the candidate's field who work at comparable or more highly ranked institutions. *Id.* § II(D).

d. End-of-semester student evaluations are "used as one form of evidence for Learning, but should not be used in isolation or as the major factor in documenting teaching effectiveness." *Id.* § II(E).

e. One sign of effective teaching is "above average" student evaluations. Ex. G at Appx. B; Ex. H at Appx. B.

f. Evaluation of a faculty member's performance in the area of learning is done by examining several types of evidence, including documentation of contributions to course development, evidence of student mentorship, student evaluations, peer evaluations, teaching awards, and evidence of continuous improvement in teaching. Ex. G at § II(I), Appx. J.

g. To evaluate the value of a candidate's scholarly production, the College assesses both quantity and, especially, quality. *Id.* § III(B).

h. The scholarship of candidates is reviewed by 5-10 external peer reviewers in the candidate's field. *Id.* § III(B)(2).

      i. For a candidate to publish a book in a major press that is independent of her dissertation exceeds the quantitative standard for excellence in discovery; the CHESS Guidelines consider even a work based on a scholar's dissertation and published in a major press to meet that standard. *Id.* § III(F).

19. CHESS does not require its faculty to obtain grants in order to qualify for promotion and tenure.

20. The Department of Behavioral Sciences ("Department") guidelines identify publication in scholarly journals, chapters in edited volumes, and academic books as the main forms of scholarship in the field of Behavioral Sciences. Ex. H § A(1)(a), Appx. A.

21. Because of its importance to faculty members' careers, the result of Purdue's tenure decision is carefully crafted to avoid surprise. In addition to providing faculty notice of specific criteria for tenure as well as qualitative and quantitative guidelines, Purdue also promises candidates annual review of their "cumulative progress toward promotion and tenure" by a committee of faculty in their departments and the chair starting at the end of their second year, and by a college committee and the dean starting in the fall of their fourth year. Ex. F § I(C)(6).

22. Pursuant to the parties' employment contract, Crisan was scheduled to apply for promotion in the 2021-22 academic year. Ex. A p. 2. However, Purdue provided

6

tenure-track faculty members the option to postpone the tenure review by one year because of difficulties many experienced during the COVID-19 pandemic.

23. Crisan applied for the COVID-19 extension and the extension was approved by the Provost. In a subsequent meeting, Crisan's chair and dean advised Crisan not to postpone her tenure application, saying she had a strong record for tenure and was "more than ready."

24. The opinions of the chair and dean were reasonable given that Crisan had received thorough and glowing annual reviews during her probationary period.

25. Just one year prior to its review of her tenure dossier, the CHESS Tenure and Promotion Committee ("CHESS Committee") reviewed Crisan's materials; concluded it was "very impressed with Dr. Crisan's record in learning, discovery, and engagement;" and concluded unanimously that she was making adequate progress toward tenure.

26. All the members of the 2021 CHESS Committee were the same as the 2020 CHESS committee except for two members. Those two members were not elected but rather were appointed by the previous dean in violation of PNW's tenure policy, which requires members of college committees to be elected. Ex. F p. 5 § D(1), p. 7 § 6.

27. The Department chair's 2020 pre-tenure evaluation of Crisan's work was similar. He concluded that she had "already met, if not surpassed, standards and expectations for tenure and promotion to associate professor at Purdue

7

University Northwest" and that she was "important to the future of the Behavioral Sciences Department."

28. Crisan exceeded the standards for tenure and promotion. She earned strong student teaching evaluations that exceeded the College average; received positive peer evaluations; demonstrated continual development of her teaching through trainings; exhibited leadership in curriculum development; and successfully mentored many students through independent studies, research projects and conference presentations. As the Promotion and Tenure Review Committee of the Department ("Department Committee") recognized, she taught a wide array of courses, including "two of our most challenging courses—*Sociological Theory* and *Introduction to Statistics*." Crisan was recognized for her excellence in teaching through the University's prestigious Teaching Incentive Program award.

29. Crisan exceeded the standards identified in the discovery category as well. She published a book that was completely independent of her dissertation with what The Department Committee described as "a highly respected publisher."

30. On top of the book, at the time of her tenure application Crisan had also published one book chapter, had a journal article accepted for publication subject to minor revisions, had two more journal articles under review, numerous professional conference presentations, and was working with a publisher on an edited volume. The journal article that was accepted subject to revisions at the time of Crisan's application was in fact published in October of 2021, prior to the

8

reviews of the CHESS Committee and Dean. The dean's office provided notice to CHESS and the University Committee of that article's publication.

31. The external reviewers Purdue contacted were unanimous in strongly supporting Crisan's application for tenure and promotion. According to the dean, "[a]ll reviewers state that Dr. Crisan's scholarly endeavors demonstrate exceptional quality and expertise; they applaud her command of the literature; describe her work as 'theoretically sophisticated while empirically grounded;' and detail how the complexity of her work contributes to the field."

32. Crisan also performed an extraordinary amount of engagement work for the University, making her strong performance in learning and discovery all the more impressive.

33. All of the scholars in Crisan's field who weighed in on her tenure case, including external reviewers, the Department Committee and the chair, determined that she met or exceeded the standards for tenure. The dean and all but two members of the CHESS Committee concurred in the positive recommendation, but six of the ten members of the 2022 University Committee recommended against tenure and promotion.

34. Purdue offered cursory explanations for the negative decision. The CHESS Committee explained, "The dissenting minority highlighted the following in support of the alternate opinion: Committee members expressed concern about insufficient refereed journal publications."

9

35. The only negative feedback in the January 2022 University Committee letter is the following:

    > Her student evaluations are generally positive although she seems to struggle somewhat in SOC 10000, SOC 22000, and CRJU 32400. . . . She does not have any refereed journal articles to date. While she has submitted some internal grant proposals, the Committee was unsure if any of the grants were funded as there is no explicit indication to that effect on her documents. One external grant submitted in 2020 with five other scholars is on the application of augmented virtual reality framework for industrial training. The Committee was hard pressed to find how the subject of this project relates to her field of sociology. . . . Due in large part to her limited research record and somewhat limited teaching performance, the Committee's opinion of the quality of her application was not unanimous.

36. As the chair of the Department of Behavioral Sciences ("the Department") pointed out in a rebuttal, the University Committee's assessment of Crisan's teaching not only excluded a wide array of evidence but also lacked any basis in fact. He wrote:

    > As department chair, I have carefully reviewed Dr. Crisan's course evaluations for almost three years now, and I do not see any trends of struggling in certain courses. Some semesters may not be as good as others, but this does not mean that they are bad. Dr. Crisan's teaching evaluations are very good, despite that women tend to be evaluated more harshly by students . . . .

37. The dean sent a January 2022 rebuttal making a similar point, emphasizing that Crisan's course evaluations were "consistently positive" and exceeded the average level of performance for instructors across PNW and CHESS.

38. The chair further noted that the Committee's assertion that Crisan did not have any refereed journal articles to date was factually incorrect and more importantly that she had published an entire peer reviewed book (which he

10

pointed out was equivalent to multiple journal articles) with a reputable publisher.

39. The University Committee's focus on whether Crisan had funded grants was misplaced since obtaining grants was not a tenure requirement for her field.

40. Nonetheless, Crisan actively sought grants, and applied for internal grants every year. During two consecutive years, Purdue chose to fund the grant application of her male departmental colleague and never funded hers.

41. The University Committee also falsely implied that the external 2020 grant for which Crisan applied was outside her field. First, such a characteristic would not necessarily violate Purdue's tenure guidelines, since Purdue claims to value interdisciplinary research. Moreover, however, the University Committee was mistaken in believing the grant application was outside Crisan's field.

42. None of the members of the University Committee who voted against Crisan's tenure work in the field of sociology.

43. Crisan's record in both learning and discovery were superior to that of the other candidate for promotion and tenure from her department during the 2021-22 year, who was male, non-Romanian, speaks with a North American accent, and was granted tenure.

44. On information and belief, Crisan's record in learning and discovery was also comparable to or superior to that of many other faculty whom Purdue has granted promotion and tenure in the last five years.

45. At some point but without any notification to Crisan, the PNW Provost and Chancellor concurred with the slim majority of the University Committee and denied Crisan tenure.

46. Crisan submitted an internal appeal, pointing out the blatant errors of the minority of reviewers identified *supra*, but Peter Hollenbeck, Purdue's Vice Provost for Faculty Affairs, found, without engaging with the specific points Crisan had made on appeal, that there was no "evidence that the committee showed negligence in assessing your record on either of these two bases" and that "the criteria of productivity and impact were fairly and consistently applied." It is not clear what assessment of impact Hollenbeck was referencing, since none of the negative feedback in the College and University Committee tenure letters made any mention of the impact of Crisan's scholarship.

47. After Purdue denied Crisan's appeal, Provost Holford responded to an inquiry from Crisan by finally issuing an official notification of her tenure denial and offering the following as a summary of the substance of his review: "My opinion was largely based on an insufficient record in discovery."

48. As a result of the above-described actions, Plaintiff will be unemployed starting in the fall semester of 2023 and expects to suffer loss of salary and benefits. She is also currently teaching her terminal year at Purdue, at a lower salary than she would have received had Purdue granted her tenure and promotion.

49. Crisan has applied to dozens of jobs since learning of her tenure denial and has not yet found employment.

## Legal Claims

### Count I
### Breach of Contract

50. Each paragraph of this Complaint is incorporated as if fully restated herein.

51. Purdue's appointment letter and tenure policies (reflected in Exhibits A-G) constitute an employment contract between Plaintiff and Defendant.

52. The policy documents referenced in Exhibits B-G contain clear promises and mutual obligations and were available at all relevant times to all faculty.

53. Crisan fulfilled her contractual obligations as a tenure-track faculty member at Purdue.

54. Purdue breached its employment contract with Crisan when it denied her tenure without assessing the totality of her record, by failing to apply its own criteria to its assessment of her record, and in reliance on material factual misrepresentations of her record.

55. To the extent that Purdue contends that Crisan's performance in discovery and learning did in fact fall short of Purdue's standards, Purdue failed to notify her of those standards, as evidenced by the positive evaluations Crisan received throughout her probationary period as well as the performance of peers who were deemed to have met the standards.

56. Purdue violated the covenant of good faith and fair dealing by determining Crisan did not meet the standards for tenure and promotion after having made the opposite determination with respect to the same criteria during the prior year's review.

57. Purdue breached its employment contract with Crisan by failing to ensure that all faculty reviewers and administrators adhered to its policies and procedures during the tenure process, even after having been notified by Plaintiff, the CHESS dean, and the Department chair of serious procedural and factual errors.

58. As a result of Purdue's actions, Crisan lost salary during the current academic year and lost the opportunity of a tenured faculty position, towards which she had been working her entire academic career.

## Count II
## Title VII Employment Discrimination

59. Each paragraph of this Complaint is incorporated as if fully restated herein.

60. Defendant denied Plaintiff's application for promotion and tenure, which resulted in termination of her employment effective in the summer of 2023.

61. Defendant treated similarly-situated, male non-Romanian faculty more favorably than Plaintiff in the assessment of their tenure and promotion applications.

62. Defendant's stated reasons for having denied Plaintiff promotion and tenure were pretext for sex and national origin discrimination.

63. Plaintiff's sex and national origin were substantial motivating factors in Defendant's denial of Crisan's application for promotion and tenure.

WHEREFORE Plaintiff prays that this Court grant judgment against Defendant and respectfully requests the following relief:

1. An order requiring Purdue to reinstate Crisan and provide her a tenure review that complies with Purdue's contractual obligations;
2. Compensation for lost salary;
3. Prejudgment interest;
4. Attorneys' fees;
5. Litigation expenses; and
6. Such other relief as law and justice allow.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby requests a trial by jury with respect to any issues so triable.

December 14, 2022　　　　　　　　Respectfully submitted,

/s/ Christopher S. Stake
Christopher S. Stake (#27356-53)
DELANEY & DELANEY LLC
3646 Washington Blvd.
Indianapolis, IN 46205
Phone: (317) 920-0400
cstake@delaneylaw.net

Rima N. Kapitan
KAPITAN GOMAA LAW, P.C.
Illinois Attorney No.: 6286541 (application for pro hac vice admission forthcoming)
P.O. Box 6779
Chicago, IL 60680
Phone: (312) 566-9590
rima@kapitangomaa.com

15